## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Apr 28 2015, 10:13 am
*Kevin S. Smith*
**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Russell Dean Bailey
Demotte, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Miller
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of M.F., Mother, and L.T.F., Child,

M.F.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

April 28, 2015

Court of Appeals Case No. 37A04-1410-JT-496

Appeal from the Jasper Circuit Court

The Honorable John D. Potter, Judge

Cause No. 37C01-1401-JT-14

**Kirsch, Judge.**

[1] M.F. ("Mother") appeals the juvenile court's order terminating her parental rights to her child, L.T.F. ("Child"). She raises the following two restated issues on appeal:

> I. Whether the juvenile court abused its discretion in denying her motion to dismiss the termination proceedings on the basis that Mother did not have legal counsel during the underlying Child in Need of Services case; and

> II. Whether sufficient evidence was presented to support the termination of Mother's parental rights.

[2] We affirm.

## Facts and Procedural History

[3] On January 7, 2013, the Indiana Department of Child Services ("DCS") received a report concerning the welfare of Child, who was two months old. A few days before, Mother and her then-boyfriend, J.L., were traveling with Child from Wisconsin to Florida when their RV broke down in Jasper County, Indiana. J.L. had a diabetic seizure and had been admitted into Jasper County Hospital on January 4, 2013. While J.L. was in the hospital, Mother wanted to stay with him, so she gave Child to a nurse working at the hospital to take care of for a couple of days. Mother told the nurse that she had no money for formula or diapers for Child.

[4] DCS family case manager ("FCM") Donald Amadei investigated the allegations on January 8, 2013, but was unable to locate Mother. Mother was eventually located on January 11 at a BP station in Remington, Indiana, where she, J.L., and Child were living in the RV. At that time, FCM Amadei found

that there was sufficient formula, diapers, and food to care for Child. On January 15, 2013, FCM Amadei returned for a follow-up visit to the BP station and found the RV was being impounded and Mother was not present. An employee of the BP station informed FCM Amadei that Child had been left in the care of a woman living in Remington. FCM Amadei located Child at a residence in a Remington trailer park. Mother had given temporary care and control of Child to a woman who lived there until she and J.L. could "get on their feet." *Appellant's App.* at 60. Child was not familiar with the caretaker, and FCM Amadei observed that the residence was filled with cigarette smoke and a number of people were coming in and out. Child was taken into the custody of DCS and placed in a foster home.

[5] DCS filed a CHINS petition alleging that Mother was unable to meet Child's basic needs for shelter and safety, had left Child with strangers until she was back on her feet, and that Mother had an open DCS case in Wisconsin regarding Child's health and lack of medical care. An initial hearing was held on the petition; Mother was present. After being advised of her rights, including the right to be represented by counsel, Mother told the juvenile court that she intended to hire private counsel. On March 1, 2013, Child was adjudicated a CHINS after Mother admitted the allegations in the petition. A dispositional hearing was held, and Mother was ordered to participate in services recommended by DCS, including: (1) complete a parenting and family functioning assessment; (2) attend twice weekly visitations with Child; (3) complete a clinical assessment and follow all recommendations; (4) maintain

stable housing and employment for six consecutive months; and (5) develop and implement a workable budget. On January 30, 2014, DCS filed a petition to terminate Mother's parental rights.[1] Mother filed a motion to dismiss the termination proceedings, which the juvenile court denied. An evidentiary hearing on the petition was held on August 22, 2014.

[6] During the hearing, the following testimony and evidence was presented. There were multiple instances of domestic and other violence during the underlying case. On March 21, 2013, Mother and J.L. threatened their apartment manager with a baseball bat and tire iron when they were told they needed to move out. On March 27, 2013, Mother contacted police and reported that J.L. had battered her in their vehicle. On May 18, 2013, Mother was involved in a domestic dispute with J.L., and they were both arrested for disorderly conduct. One of Mother's home-based case workers witnessed two incidents between Mother and J.L. where the police had to be called. On April 22, 2014, the police were called because Mother and J.L. threatened their landlord when they were evicted from their apartment. On May 22, 2014, Mother called the police to report that she had been battered by J.L. When the police arrived, J.L. was no longer there, but Mother had abrasions on her chest, right arm, and right leg and a swollen eye. When J.L. was located, he had a large scratch on his arm and was subsequently arrested. Mother broke up with

---

[1] During the pendency of this case, it was determined via paternity testing that J.O. was the biological father of Child. His parental rights were also involuntarily terminated concurrently with Mother's parental rights. However, J.O. does not join in this appeal.

J.L. after that incident and moved to a domestic violence shelter. However, Mother testified that there were times in the past where she separated from him and then changed her mind.

[7] At the dispositional hearing in March 2013, Mother was referred to home-based therapy to address issues of domestic violence and home-based management to address her instability issues. Initially, Mother was not compliant with these services. One of the home-based service providers attempted to contact Mother to schedule services and was unable to reach her. On April 30, 2013, Mother completed a parenting assessment and a mental health assessment, which both recommended that she: (1) participate in individual therapy to address symptoms of anxiety, depression, mood swings, and coping mechanisms; (2) receive case management to help in finding and maintaining stable housing and learning parenting skills; (3) continue supervised visitation with Child; and (4) complete a medication evaluation for anti-anxiety medication and take all prescribed medications. When Mother began working with the home-based service providers, she did well with the parenting curriculum, but had difficulty maintaining stable housing and employment. As of January 2014, Mother had failed to participate in home-based therapy as recommended, but began scheduled appointments later that month. From January 13, 2014 through June 25, 2014, Mother had eighteen scheduled appointments; she cancelled eight. In June 2014, Mother was continuing with home-based services, and while she was open to parenting education, she still struggled with maintaining

employment. Mother never completed a psychiatric evaluation for medication and remained inconsistent in maintaining weekly contact with DCS.

[8] Mother attended seventy out of ninety of the scheduled visits with Child during the underlying case. At the visits, Mother interacted appropriately with Child, but was easily distracted by her cell phone and other issues going on in her life. Mother also used inappropriate language during visits and had to be redirected several times for doing so. Between January 2014 and June 2014, Mother began having transportation issues, and struggled to make it to visitations. During that period of time, she missed seven out of twenty-two scheduled appointments.

[9] During the underlying case, Mother had multiple jobs and residences. Between April 2013 and August 2013, she was employed at four different locations, including Denny's, a construction job, an Italian restaurant, and Pizza Hut. From February 2014 until April 2014, Mother worked at Kokomo Cab, and in May 2014, she began working at Allied Steel, but was let go the next month. Shortly before the evidentiary hearing, Mother was hired at Subway and was supposed to start work the day before the hearing, but was unable to do so because she did not have the appropriate clothes. Mother also testified that, at the time of the hearing, she was planning to begin employment at Chipotle, but had not yet undergone the background check or started working. She had ten different jobs during the underlying case.

[10] Mother had fourteen different residences during the pendency of the underlying case. These included living in an RV at a BP station, a Tuffy's parking lot, the AOK campground, the First Assembly Church parking lot, and on her boss's property. She also lived at a YMCA shelter, a domestic violence shelter in Kokomo, and with a family she met at church. Mother had been evicted from two different places since January 2013 and was kicked out of a domestic violence shelter for threatening another shelter resident. At the time of the hearing, Mother was living with a new boyfriend, A.S., in a trailer. She had only been living with him for about a month and had known him for about three or four months. Mother and A.S. lived in a two-bedroom trailer that had no working electricity at the time of the hearing due to a past tenant not paying the bill. A home-based case manager testified that the trailer lacked a screen in the front door, had plywood on the floor which was unsafe for Child, was dirty, and had fleas from animals. Mother testified that she and A.S. split the $275 per month rent equally.

[11] At the time of the hearing, Child had been removed from Mother's care for approximately twenty months. In that time, Mother's DCS case manager testified that Mother had made no progress in the goals given to her by DCS and that there was no evidence that Mother would change her ways. *Tr.* at 25-26. She further testified that Mother had failed to show that she had the ability to provide Child with a safe and stable home environment. *Id.* at 26. The DCS case manager also stated she believed that termination was in the best interests of Child because Child had a significant bond with the foster parents and

needed permanency, which the foster family could provide. *Id.* The court appointed special advocate ("CASA") also recommended termination and testified that, although Mother loved Child, she had made no real progress and could not provide Child with a stable or permanent home. *Id.* at 86. The DCS plan for Child was adoption. On September 22, 2014, the juvenile court issued its findings, conclusions, and order terminating Mother's parental rights. Mother now appeals.

# Discussion and Decision

## I. Motion to Dismiss

[12] Mother argues that the juvenile court abused its discretion when it denied her motion to dismiss the termination proceedings. She specifically contends that the juvenile court should have granted her motion to dismiss because she did not have counsel during the CHINS proceedings. Mother claims that she did not knowingly or voluntarily waive her right to counsel during the CHINS proceedings, and therefore, her due process rights were violated.

[13] "When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process." *In re G.P.*, 4 N.E.3d 1158, 1165 (Ind. 2014) (quotations omitted). "Likewise, due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children." *Id.* (quotation omitted). Our Supreme Court has, therefore, urged that the utmost caution should be used when "interfering with

the makeup of a family and entering a legal world that could end up in a separate proceeding with parental rights being terminated." *In re K.D. & K.S., S.S. v. Ind. Dep't of Child Servs.,* 962 N.E.2d 1249, 1259 (Ind. 2012). Thus, in termination cases when it is argued that a parent's due process rights were violated as to the appointment of counsel in the CHINS proceedings, we balance the following three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. *In re G.P.*, 4 N.E.3d at 1165-66. In the present case, both the private and governmental interests at issue are substantial. We must, therefore, determine the risk of error created when counsel was not appointed during the CHINS proceedings.

[14] Mother relies heavily on *In re G.P.* in her argument that her due process rights were violated when she was not appointed counsel during the CHINS proceedings. However, that case is easily distinguished from the present case. There, the mother first waived counsel and admitted the CHINs allegations; however, in a later CHINS hearing, she requested the appointment of legal counsel in her CHINS case. 4 N.E.3d at 1160. After it determined that the mother was entitled to counsel, the trial court said it would appoint her counsel, but never did so. *Id.* Later, after the termination petition was filed, and the mother again requested that counsel be appointed, the trial court appointed her a public defender. *Id.* at 1161. The mother's public defender filed a motion to dismiss, which was denied by the trial court, and the mother's parental rights

were eventually terminated. *Id.* Our Supreme Court found that the mother was denied due process because statutory law requires that an "indigent parent *who requests a court-appointed attorney* in a CHINS proceeding and is found by the trial court to be indigent" must be appointed counsel. *Id.* at 1163 (emphasis added). Because the mother had requested that counsel be appointed and was told she would receive appointed counsel, the Supreme Court determined that the trial court erred in not appointing counsel until later in the termination proceedings. *Id.* at 1166.

[15] The present case is substantially different. Here, the record is clear that Mother was advised of her rights including the right to counsel during the initial hearing in the CHINS case. *Appellant's App.* at 16. At that time, she told the juvenile court that she intended to hire private counsel. *Id.* Additionally, unlike the mother in *In re G.P.*, there is nothing in the record to indicate that, after waiving the appointment of counsel, Mother ever changed her mind and ever requested the appointment of counsel. Further, there was no indication that the juvenile court ever denied her the appointment of counsel at any point during the course of the proceedings. Our Supreme Court made it clear that when an "indigent parent . . . *requests a court-appointed attorney* in a CHINS proceeding and is found by the trial court to be indigent[,]" the parent must be appointed counsel. *In re G.P.*, 4 N.E.3d at 1163 (emphasis added). Here, the record does not reflect that Mother ever requested appointed counsel, and therefore, she cannot show a due process violation. Mother cannot indicate anywhere in the record where she was not advised of her right to counsel when she should have been, where she

requested appointed counsel and was not appointed such, or where she requested but was denied appointed counsel. We conclude that she has not shown a due process violation, and the juvenile court did not abuse its discretion in denying her motion to dismiss the termination proceedings.

## II. Sufficient Evidence

[16] We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

[17] Here, in terminating Mother's parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to

support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[18] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[19] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[20] Mother argues that DCS failed to prove the required elements for termination by sufficient evidence. Specifically, Mother only contends that DCS failed to present sufficient evidence that the conditions that resulted in Child being removed would not be remedied. She asserts that, although she was initially not compliant with services, she became more compliant over time and attended counseling and visitations. She also concedes that there were a few incidents of domestic violence involving J.L. during the CHINS case, but by the time of the hearing, she was no longer with him. Mother further claims that she attended her therapy and was making progress toward her case plan objectives at the time of the hearing.

[21] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id*. Second, "we

'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id*. (citing *In re I.A.,* 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.,* 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id*. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id*.

[22] Here, the evidence showed that Child was removed from Mother's care based on Mother's inability to meet Child's basic needs for shelter and safety due to the fact that they were living in an RV that was recently impounded and Mother had left Child in the care of strangers until she could get back on her feet. The case, therefore, began because of instability in Mother's life and lack of housing and employment, which continued throughout the duration of the case. After Child was removed due to being left with strangers and Mother's admitted inability to care for Child at the time, Mother's inconsistent living situation was never remedied and she had fourteen different housing arrangements during the underlying proceedings.

[23] Pursuant to the dispositional order, Mother was ordered to maintain stable housing and employment for six consecutive months. During the pendency of the case, Mother's housing included living in an RV at a BP station, a Tuffy's parking lot, the AOK campground, the First Assembly Church parking lot, and on her boss's property. She also lived at a YMCA shelter, a domestic violence shelter in Kokomo, and with a family she met at church. Mother was evicted from two different places and was kicked out of a domestic violence shelter for threatening another shelter resident. At the time of the hearing, Mother was living with a new boyfriend, A.S., in a trailer and had only been living with him for about a month, after knowing him for about three or four months. The home they were living in was a two-bedroom trailer that had no working electricity and lacked a screen in the front door, had plywood on the floor which was unsafe for Child, was dirty, and had fleas from animals.

[24] Mother's employment during the underlying case was similarly inconsistent. She had ten different jobs during pendency of the case, none of which lasted more than a few months. At the time of the hearing, Mother was supposed to have started a new job at Subway the day before, but she did not go because she did not have the appropriate clothes. She also stated she was going to start a second job, but had not yet undergone the background check. The evidence presented, therefore, showed that Mother was not able to remedy the reasons that resulted in the removal of Child from her care, her instability and inability to meet the needs of Child.

[25] Additionally, there was a history of domestic violence, which continued throughout the underlying case. There were many incidents of domestic violence and other violence reported concerning Mother and J.L. On two different occasions, Mother and J.L. threatened a landlord when they were told they were being evicted. The police were called several times by Mother on reports of domestic violence by J.L. On one occasion, both Mother and J.L. were arrested for disorderly conduct, and on at least one occasion, J.L. was arrested for battering Mother. Mother was also asked to leave a domestic violence shelter when she threatened another resident.

[26] There was also testimony that, although Mother attended visitations and participated in home-based services, she was initially not compliant. The DCS case worker assigned to Mother's case testified that Mother complied with services off and on, but made no progress toward the goals and objectives established for her by DCS. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal and the reasons for continued placement of Child outside Mother's home would not be remedied.

[27] We will reverse a termination of parental rights "only upon a showing of 'clear error' -- that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Child was clearly erroneous. Further, Mother's arguments

are merely a request for us to reweigh the evidence and judge the credibility of the witnesses, which we cannot do on appeal. *In re D.D.*, 804 N.E.2d at 265. We affirm the juvenile court's judgment.

Affirmed.

Vaidik, C.J., and Bradford, J., concur.